**E-FILED**
Tuesday, 30 June, 2015  03:26:50 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| **U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor-in-interest to Wells Fargo Bank, N.A., as Trustee, for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4**, | Case No. 3:15-cv-3199 |

and

**U.S. Bank National Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5**,

      Plaintiffs,

v.

**Springfield Prairie Properties, LLC**, an Illinois limited liability company; **Robert W. Egizii**, an individual; **Thomas Egizii**, an individual; **Michael Egizii**, an individual; **Rodney Egizii**, an individual; **Jodi Baptist**, an individual; **John Pruitt**, an individual; **Clyde Beimfohr**, an individual; **EEI Holding Corporation**, an Illinois corporation; and **Egizii Property Managers, LLC**, an Illinois limited liability company,

      Defendants.

---

Cara M. Houck
MILLER, CANFIELD, PADDOCK AND STONE,
   P.L.C.
*Attorneys for Plaintiffs*
225 West Washington Street
Suite 2600
Chicago, Illinois 60606
(312) 460-4200

## COMPLAINT

Plaintiffs U.S. Bank National Association, as Trustee, successor-in-interest to Bank of America, N.A., as Trustee, successor-in-interest to Wells Fargo Bank, N.A., as Trustee, for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4 (the "*A Note Holder*") and U.S. Bank National Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5 (the "*B Note Holder*," and together with the A Note Holder, "*Lender*") state as follows for their Complaint against Defendants Springfield Prairie Properties, LLC ("*Borrower*"); Robert W. Egizii ("*Egizii*"); Thomas Egizii, Michael Egizii, Rodney Egizii, Jodi Baptist, John Pruitt and Clyde Beimfohr (together with Egizii, the "*Members*"); EEI Holding Corporation ("*EEI Holding Corporation*"); and Egizii Property Managers, LLC ("*Egizii Property Managers*") (together, "*Defendants*"):

### PARTIES, JURISDICTION AND VENUE

1.     The A Note Holder is a real estate mortgage investment conduit (REMIC) trust whose trustee, U.S. Bank National Association ("*Trustee*"), possesses customary powers to hold, manage and dispose of assets for the benefit of the A Note Holder's beneficiaries. As a result, the Trustee is an active trustee whose control over the assets held in its name is real and substantial. Accordingly the A Note Holder's citizenship is established by virtue of its Trustee, a national banking association having its main office in Ohio, as set forth in its articles of association. The A Note Holder is therefore a citizen of the State of Ohio.

2.     Likewise, the B Note Holder is a real estate mortgage investment conduit (REMIC) trust whose trustee is the above defined Trustee. The Trustee possesses customary powers to hold, manage and dispose of assets for the benefit of the B Note Holder's beneficiaries. As a result, the Trustee is an active trustee whose control over the assets held in its name is real and substantial. Accordingly the B Note Holder's citizenship is established by virtue

of its Trustee, a national banking association having its main office in Ohio, as set forth in its articles of association. The B Note Holder is therefore a citizen of the State of Ohio.

3. The A Note Holder files this action (a) on its own behalf as holder of the A Note (defined below); and (b) as collateral agent for the benefit and on behalf of each of (i) the Registered Holders Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, and (ii) U.S. Bank National Association, as Trustee for the Registered Holders of the Mezz Cap Commercial Mortgage Trust 2007-C5, Commercial Mortgage Pass-Through Certificates, Series 2007-C5.

4. Upon information and belief, the Members are each domiciled in Illinois, and are therefore citizens of Illinois.

5. Borrower is a limited liability company organized under the laws of the State of Illinois. Upon information and belief, Borrower's principle place of business is 700 North MacArthur, Springfield, Illinois.

6. Upon information and belief, Borrower's members are the above defined Members. Because the Members are each domiciled in Illinois, Borrower is a citizen of Illinois.

7. Robert W. Egizii is an individual who, upon information and belief, resides at 1645 West Laurel Street, Springfield, Illinois 62704-3320.

8. Thomas Egizii is an individual who, upon information and belief, resides at 3104 Panther Creek Drive, Springfield, Illinois 62711-7834.

9. Michael Egizii is an individual who, upon information and belief, resides at 803 North Bunchberry Court, Athens, Illinois 62613-9478.

10. Rodney Egizii is an individual who, upon information and belief, resides at 3701 Wabash Avenue, Springfield, Illinois 62711-6261.

11. Jodi Baptist is an individual who, upon information and belief, resides at 4645 Barrington Drive, Springfield, Illinois 62711-7262.

12. John Pruitt is an individual who, upon information and belief, resides at 1 East Lake Shore Lane, Springfield, Illinois 62712-8919.

13. Clyde Beimfohr is an individual who, upon information and belief, resides at 540 North Railway Street, Mascoutah, Illinois 62258-1325.

14. EEI Holding Corporation is a corporation organized under the laws of the State of Illinois. Upon information and belief, EEI Holding Corporation's principal place of business and headquarters are each in Illinois.

15. Egizii Property Managers is a limited liability company organized under the laws of the State of Illinois. Upon information and belief, Egizii Property Managers' principal place of business is 700 North MacArthur, Springfield, Illinois. Upon information and belief, Egizii Property Managers' members are domiciled in Illinois, and none is domiciled in Ohio. Accordingly, Egizii Property Managers is a citizen of Illinois.

16. This Court has diversity jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because (a) complete diversity of citizenship exists, and (b) the amount in controversy exceeds $75,000, exclusive of interest and costs.

17. Defendants are subject to personal jurisdiction in this District, and venue is proper in this District, pursuant to 28 U.S.C. § 1391(b)(2).

GENERAL ALLEGATIONS

*The Loan Documents and Assignment of the Loan*

18. On or about June 4, 2007, Borrower received a $21,920,000 commercial loan (the "*A Loan*") from Column Financial, Inc. ("*Column*").

19. To evidence and secure its payment obligations under the A Loan, Borrower executed and delivered certain loan documents to Column (the "*A Loan Documents*"), which include, without limitation, the following (each dated June 4, 2007, unless otherwise noted):

a. A *Promissory Note (A Note)* (the "*A Note*"), a true and complete copy of which is attached as EXHIBIT A.

b. A *Mortgage, Security Agreement and Fixture Financing Statement* recorded June 6, 2007 as Document No. 2007R02766, Christian County Records (the "*Christian*

4

*County Mortgage*"), a true and complete copy of which is attached as EXHIBIT B-1.

c. A *Mortgage, Security Agreement and Fixture Financing Statement* recorded on June 6, 2007 as Document No. 2007R20123, Sangamon County Records (the "***Sangamon County Mortgage***," and together with the Christian County Mortgage, the "***Mortgages***"), a true and complete copy of which is attached as EXHIBIT C-1.

d. An *Indemnity and Guaranty Agreement* executed by Egizii, a true and complete copy of which is attached as EXHIBIT D-1.

20.     Under the Mortgages, Borrower granted a lien on various parcels of real estate that include, without limitation, real estate having a common address of 700 North MacArthur Blvd., Springfield, Illinois (the "***North MacArthur Property***").

21.     On or about June 4, 2007, Borrower also received a $1,420,000 commercial loan (the "***B Loan***," together with the A Loan, the "***Loan***") from Column.

22.     To evidence its obligations under the B Loan, Borrower executed and delivered to Column a *Promissory Note (B Note)* dated effective as of June 4, 2007 (the "***B Note***," and together with the A Note, the "***Note***"), a true and complete copy of which is attached as EXHIBIT E.

23.     The B Note is further secured by the Mortgages and certain other A Loan Documents. The Note, A Loan Documents and other documents executed and delivered in connection with the A Loan and B Loan are collectively referred to as the "***Loan Documents***."

24.     The A Loan and A Loan Documents were assigned to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, by virtue of documents including, but not limited to, the following:

a. An *Allonge to Promissory Note (A Note)* affixed to the Note, a true and complete copy of which is attached as part of EXHIBIT A.

5

    b. An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement* dated February 20, 2008 and recorded March 10, 2008 as Document No. 2008R01165, Christian County Records, a true and complete copy of which is attached as EXHIBIT B-2.

    c. An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement* dated February 20, 2008 and recorded March 17, 2008 as Document No. 2008R11182, Sangamon County Records, a true and complete copy of which is attached as EXHIBIT C-2.

    d. A *General Assignment*, a true and complete copy of which is attached as EXHIBIT D-2.

25. The A Loan and A Loan Documents were further assigned to Bank of America, N.A., as Trustee for the Registered Holders of Credit Suisse First Boston Mortgage Securities Corp., Commercial Mortgage Pass-Through Certificates, Series 2007-C4, by virtue of documents including, but not limited to, the following:

    a. An *Allonge* affixed to the Note, a true and complete copy of which is attached as part of EXHIBIT A.

    b. An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement* dated June 30, 2009 and recorded September 28, 2009 as Document No. 2009R05520, Christian County Records, a true and complete copy of which is attached as EXHIBIT B-3.

    c. An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement and Assignment of Assignment of Leases and Rents* dated June 30, 2009 and recorded December 1, 2009 as Document No. 2009R54382, Sangamon County Records, a true and complete copy of which is attached as EXHIBIT C-3.

    d. An *Omnibus Assignment*, a true and complete copy of which is attached as EXHIBIT D-3.

26.     The A Loan and A Loan Documents were subsequently assigned to the A Note Holder, by virtue of documents including, but not limited to, the following:

a.  An *Allonge* affixed to the Note, a true and complete copy of which is attached as part of EXHIBIT A.

b.  An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement and Assignment of Assignment of Leases and Rents* dated April 23, 2013 and recorded May 1, 2013 as Document No. 2013R01846, Christian County Records, a true and complete copy of which is attached as EXHIBIT B-4.

c.  An *Assignment of Mortgage, Security Agreement, and Fixture Financing Statement and Assignment of Assignment of Leases and Rents* dated April 23, 2013 and recorded April 29, 2013 as Document No. 2013R13887, Sangamon County Records, a true and complete copy of which is attached as EXHIBIT C-4.

d.  An *Omnibus Assignment*, a true and complete copy of which is attached as EXHIBIT D-4.

27.     The B Note has been assigned to the B Note Holder. The allonges accomplishing this assignment are affixed to the B Note, a true and complete copy of which is attached as EXHIBIT E.

***Borrower's Defaults Under the Loan***

28.     Borrower has defaulted under the Loan and Loan Documents. These defaults include, without limitation, failure to make the payments due under the terms of the Loan from October 11, 2012 to the present.

29.     Lender sent formal notice of default to Borrower and Egizii on March 28, 2013 (the "***Demand Letter***"), and demanded payment in full. A true and complete copy of the Demand Letter is attached as EXHIBIT F.

30.     The Demand Letter informed Borrower and Egizii that the maturity of the Loan had been accelerated, confirmed that all Rents and Cash Collateral (as defined in the Default Letter) were Lender's collateral and could not be used to pay attorneys' fees associated with Borrower's defaults.

31.     As of June 11, 2015, the amount due and owing on the Loan is as follows:

| A-Loan | |
|---|---:|
| Principal: | $20,481,999.56 |
| Contract Interest: | 3,479,268.73 |
| Late Charges: | 287,558.03 |
| Default Interest: | 2,679,728.27 |
| Prepayment Penalties | 2,387,371.45 |
| Lender Expense Holdback | 2,500.00 |
| **Subtotal** | **$29,318,426.04** |
| Lender Expenses | |
| Taxes and Insurance | 720,230.14 |
| Property Protection Advances | 188,221.85 |
| Miscellaneous Advances | 253,341.61 |
| Additional items | 300.00 |
| Interest on Advances | 185,774.02 |
| Special Servicing Fees | 169,342.54 |
| Lender Expenses  Subtotal | **$1,517,210.16** |
| Funds Held | |
| Present Tax Escrow | 924,950.78 |
| Present Insurance Escrow | (68,986.43) |
| Present Reserves | (715,842.87) |
| Present Suspense (Unapplied) Funds | (755,462.00) |
| Funds Held: Subtotal | (615,340.52) |
| Resolution Fee | **$308,356.36** |
| **ESTIMATED PAYOFF AMOUNT** | **$30,528,652.04** |
| *Per Diem Contract Interest* | *$3,575.82* |
| *Per Diem Default Interest* | *$2,844.72* |
| *Per Diem Lender Expenses* | *$619.94* |

8

| B-Loan | |
|---|---|
| Principal: | $1,405,102.10 |
| Interest: | 450,393.77 |
| Default Interest: | 183,834.21 |
| Late Fees Due: | 23,064.31 |
| Estimated Prepayment Compensation/"YM" | |
| Yield Maintenance Calculation | 338,099.51 |
| Payoff Processing Fee | 1,300.00 |
| **Subtotal** | **$2,401,793.90** |
| | |
| **ESTIMATED PAYOFF AMOUNT** | **$2,401,793.90** |
| | |
| *Per Diem Contract Interest* | *$478.13* |
| *Per Diem Default Interest* | *$195.15* |
| *Per Diem Lender Expenses* | |

This amount: (1) continues to accrue interest, and default interest from and after the above date, (2) is in addition to any additional prepayment premiums or defeasance payments as called for under the terms of the Loan Documents, and all costs and expenses incurred by Plaintiff, including all attorneys' fees, and (3) reflects the subtraction of amounts held in escrow and/or reserve accounts, if any

32.     Borrower has not paid the accelerated Loan balance, nor has Borrower turned over to Lender all Rents and Cash Collateral collected by Borrower, as demanded in the Demand Letter.

33.     Borrower represented and warranted that it did not and would not own any assets other than the collateral secured by the Mortgages.

34.     The fair value of the collateral described in the Mortgages is substantially less than Borrower's liabilities under the Loan.

35.     At least as of the date the Loan was accelerated, Borrower was insolvent.

36.     Borrower failed to repay the Loan, and is unable to pay its full liability under the Loan.

*Egizii Operates Numerous Corporate Entities as Alter Egos of Himself*

37.    Egizii has, either directly as an individual or indirectly through entities he controlled, owned the North MacArthur Property continuously at least from January 2, 1998 to December 23, 2014.

38.    Upon information and belief, Egizii owns 35.54% of Borrower and 18.2% of the Egizii Family Limited Partnership which is a 23% owner of Borrower.

39.    Upon information and belief, the Members also include familial relations of Egizii, who own an additional 16% of Borrower.

40.    Upon information and belief, Egizii is the President, CEO and primary stockholder of EEI Holding Corporation.

41.    Upon information and belief, Egizii Electric, Inc. ("*Egizii Electric*") is or was a division of and/or alternate name by EEI Holding Corporation.

42.    Upon information and belief, Egizii is the President and CEO of Egizii Electric.

43.    Upon information and belief, Egizii acted as the Manager of 700 North MacArthur, LLC.

44.    Egizii Property Managers managed the North MacArthur Property on behalf of Borrower, and possibly on behalf of Egizii (individually) and 700 North MacArthur, LLC, during some or all of the time periods relevant to this Complaint.

45.    Upon information and belief, Borrower failed to observe corporate formalities.

46.    Upon information and belief, Egizii was the only member, officer or director of Borrower who exercised meaningful control over Borrower.

47.    Upon information and belief, other than Egizii, the Members and the individuals nominally designated as officers and directors of Borrower, if any, played no meaningful role in the management or operations of those entities.

48.    Upon information and belief, EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC, and Egizii Property Managers also each failed to observe corporate formalities with respect to transactions involving the North MacArthur Property.

10

49.     Upon information and belief, Egizii was the only member, officer or director of each of EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC, and Egizii Property Managers who exercised meaningful control over those entities with respect to the North MacArthur Property.

50.     Upon information and belief, other than Egizii, the members and the individuals nominally designated as officers and directors of EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC, and Egizii Property Managers played no meaningful role in the management or operations of those entities with respect to the North MacArthur Property.

51.     Upon information and belief, Borrower failed to maintain complete, separate and distinct corporate records from EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC, and Egizii Property Managers with respect to the North MacArthur Property.

52.     Upon information and belief, the relationships between and among Borrower, EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC and Egizii Property Managers were not arm's-length relationships.

53.     At least as of the date the Loan was accelerated, Borrower was insolvent.

54.     Upon information and belief, Borrower commingled its funds with those of, or voluntarily paid for or made itself liable for the debts of, EEI Holding Corporation/Egizii Electric, Egizii Property Managers or both.

55.     Upon information and belief, such commingling of funds, obligations or both includes, but is not limited to, Borrower's payments to one or more of the Law Firms as part of the Collateral Transfers (each defined below) for the benefit of one or more of EEI Holding Corporation/Egizii Electric, Egizii Property Managers and other entities owned or controlled by Egizii.

56.     Upon information and belief, to the detriment of creditors, Egizii diverted assets (directly, indirectly or both) from Borrower to EEI Holding Corporation/Egizii Electric, Egizii Property Managers, other Members, or some combination of them.

57.     Upon information and belief, such direct and indirect diversions include, but are not limited to, the Egizii Lease Transactions and the Collateral Transfers (each defined below).

58.     Upon information and belief, Borrower, EEI Holding Corporation/Egizii Electric, 700 North MacArthur, LLC, and Egizii Property Managers were mere facades for the operations of Egizii in connection with the North MacArthur Property.

59.     In light of these facts, Borrower functions as a mere instrumentality, alter ego and agent of Egizii.

60.     In light of these facts, 700 North MacArthur, LLC functions as a mere instrumentality, alter ego and agent of Egizii.

61.     In light of these facts, EEI Holding Corporation/Egizii Electric functions as a mere instrumentality, alter ego and agent of Egizii, other insiders or both with respect to the North MacArthur Property.

62.     In light of these facts, Egizii Property Managers functions as a mere instrumentality, alter ego and agent of Egizii with respect to the North MacArthur Property.

### The Egizii Electric Lease

63.     On or about January 2, 1998, Egizii (in his individual capacity) entered into a certain *Lease* (the "*Lease*") with Egizii Electric for occupancy of the North MacArthur Property (the "*Premises*"). A true and complete copy of the Lease is attached as EXHIBIT G-1.

64.     The Lease describes an aggregate leased premises of not less than 94,290 square feet.

65.     Egizii signed the Lease on behalf of himself individually (as lessor), and on behalf of Egizii Electric (as lessee).

66.     Effective December 1, 2002, the Lease was amended to change monthly rent installments to $27,100.00 per month ("*Lease Amendment No. 1*"). A true and complete copy of Lease Amendment No. 1 is attached as EXHIBIT G-2.

67. Egizii signed Lease Amendment No. 1 on behalf of himself individually (as lessor), and as CEO on behalf of Egizii Electric (as lessee).

68. Effective August 27, 2006, Egizii Electric and "700 North MacArthur, LLC (Robert Egizii) (Lessor)" entered into a certain *Amendment No. 2 to Lease Agreement* ("*Lease Amendment No. 2*") to (i) extend the Lease to December 31, 2016, and (ii) maintain the monthly rent installment at $27,100.00 per month. A true and complete copy of Lease Amendment No. 2 is attached as EXHIBIT G-3.

69. Egizii signed Lease Amendment No. 2 as Manager on behalf of 700 North MacArthur, LLC (as lessor), and as CEO on behalf of Egizii Electric (as lessee).

70. Upon information and belief, no formal assignment of the lessor's interest in the Lease from Egizii to 700 North MacArthur, LLC was executed before Lease Amendment No. 2 was signed.

71. On or about September 1, 2009, Borrower (as lessor) and EEI Holding Corporation (as lessee) entered into a certain *Amendment No. 3 to Lease Agreement* ("*Lease Amendment No. 3*," and together with Lease Amendment No. 1 and Lease Amendment No. 2, the "*Lease Amendments*") that (i) decreased rent from $27,100.00 per month to $22,000.00 per month for twenty-four months beginning September 1, 2009, and (ii) provided that rent would return to $27,100.00 per month beginning on September 1, 2011. A true and complete copy of Lease Amendment No. 3 is attached as EXHIBIT G-4.

72. Egizii signed Lease Amendment No. 3 as the President of Springfield Prairie Properties SPE, Inc., the Manager of Springfield Prairie Properties, LLC (as lessor).

73. Upon information and belief, no formal assignment of the lessor's interest in the Lease from either Egizii or 700 North MacArthur, LLC to Borrower was executed before Lease Amendment No. 3 was signed.

74. Under the Mortgage, Borrower is required to obtain Lender's prior written approval for any lease for more than 7,500 square feet, must be arms-length and may not include non-market rental or other concessions:

13

> **Borrower** covenants and agrees that it **shall not enter into any lease affecting 7,500 square feet or more of the Property** or having a term (including any renewal or extension term) of more than ten (10) years **without the prior written approval of Lender**, which approval shall not be unreasonably withheld. . . . Borrower shall furnish to Lender (and any loan servicer specified from time to time by Lender): (i) such biographical and financial information about the proposed tenant as Lender may reasonably require in conjunction with its review, (ii) **a copy of the proposed form of lease**, and (iii) a summary of the material terms of such proposed lease (including, without limitation, rental terms and the term of the proposed lease and any options**). It is acknowledged that Lender intends to include among its criteria for approval of any such proposed lease the following: (i) such lease shall be with a bona-fide arm's length tenant; (ii) such lease shall not contain any rental or other concessions which are not then customary and reasonable for similar properties and leases in the market area of the Land**; (iii) such lease shall provide that the tenant pays for its expenses; **(iv) the rental shall be at least at the market rate then prevailing for similar properties and leases in the market areas of the Land**; and (v) such lease shall contain subordination and attornment provisions in form and content reasonably acceptable to Lender.

Mortgages, Exs. B and C, Section 1.12(a) (emphasis added).

75.    Despite this provision of the Mortgage, Borrower did not request or receive Lender's approval for Lease Amendment No. 3.

76.    Upon information and belief, contrary to the terms of Lease Amendment No. 3, EEI Holding Corporation/Egizii Electric continued paying rent at the rate of $22,000.00 per month from September 1, 2011 to October 1, 2012.

77.    Upon information and belief, Borrower never made any demand or other attempt to enforce the rental rate's return from $22,000.00 per month to $27,100.00 per month at any time from September 1, 2011 to the present.

78.    In fact, on October 31, 2012, an email was sent by Vince Toolen of Egizii Property Managers, as Leasing Manager on Borrower's behalf, attaching a letter dated

14

November 1, 2012 to Lender asserting that the then-current rental rate was $22,000 per month. A true and complete copy of this letter is attached as EXHIBIT G-5.

79.    Pursuant to this communication, Vince Toolen of Egizii Property Managers, as Leasing Manager on Borrower's behalf, asked that the Lender approve "a rent reduction from $22,000 to $11,000" per month.

80.    Attached to this October 31, 2012 request was (i) an October 31, 2012 letter from EEI Holding Corporation, and (ii) a November 1, 2012 letter from Borrower.

81.    The October 31, 2012 request did not provide a copy of the proposed lease.

82.    The October 31, 2012 request did not involve a bona-fide arm's length tenant, and either included rental concessions that were not customary or reasonable, or rental rates that were well below the prevailing market rate for similar properties and leases in the market area.

83.    The letter from EEI Holding Corporation stated, without limitation, as follows:

> We know that this is a significant reduction and would like to assure you that should you grant our request for the reduction that our primary stockholder has committed to paying the new lease payment personally should the company be unable to do so.

Ex. G-5.

84.    Lender never approved Borrower's request to reduce the monthly rent due from EEI Holding Corporation/Egizii Electric.

85.    Upon information and belief, no amendment to the Lease was executed to memorialize a reduction in rent to $11,000.00 per month. *See* email from James R. Potter dated June 2, 2014, enclosing marked-up estoppel certificate, a true and complete copy of which is attached as EXHIBIT G-6 (mark-up not identifying any written amendment other than the Lease Amendments).

86.    Upon information and belief, little or no consideration was exchanged for any reduction in rent to $11,000.00 per month.

87. Despite this, Borrower has subsequently indicated that the monthly lease payment owed by EEI Holding Corporation/Egizii Electric was $11,000.00 per month. A true and complete copy of the rent roll delivered by Borrower to Lender as of January 13, 2014 reflecting this rental rate is attached as EXHIBIT G-7 (EEI Holding Corporation being listed under the name of Egizii Electric).

88. Borrower also indicated that EEI Holding Corporation/Egizii Electric would now occupy 19,750 square feet instead of the 45,547 square feet originally contracted for, despite a lease amendment to reflect such a change. *Id.*; *cf.* Lease, Ex. G-1

89. Despite the foregoing, EEI Holding Corporation/Egizii Electric has not made any rental payment for almost three years or since November 1, 2012. *See* Ex. G-6.

90. EEI Holding Corporation/Egizii Electric continued its failure to pay rent, and Borrower and Egizii continued to conceal this disclosure from Lender, long after Borrower's default in October 2012 and Lender's Demand Letter in March 2013.

91. Lender was not informed that EEI Holding Corporation/Egizii Electric had ceased making rental payments until on or about June 2, 2014. *Id.*

92. Upon information and belief, Borrower never took any action to default EEI Holding Corporation/Egizii Electric or collect the delinquent rental payments.

93. Specifically, but without limitation, and upon information and belief, Borrower never sent any notices of default to EEI Holding Corporation/Egizii Electric, never attempted to evict EEI Holding Corporation/Egizii Electric from the North MacArthur Property, and never filed suit to recover the delinquent rental payments.

94. EEI Holding Corporation/Egizii Electric has not made any rental payments at any time from and after November 1, 2012—even after a receiver was appointed over the North MacArthur Property and other real estate secured by the Mortgages in December 2014 (see below).

95. Borrower received no consideration for the purported decrease in rental rate due from EEI Holding Corporation/Egizii Electric, nor did it receive consideration for permitting EEI

Holding Corporation/Egizii Electric to continue occupying the North MacArthur Property despite not paying rent.

96.     Borrower defaulted on the Loan contemporaneously with EEI Holding Corporation/Egizii Electric's failure to pay rent to Borrower.

97.     Borrower was insolvent at least as of the date that the Loan was accelerated in March 2013—a short time after the request and purported reduction in EEI Holding Corporation's rent to $11,000.00 per month.

98.     Egizii effectively removed or concealed Borrower's assets by permitting EEI Holding Corporation/Egizii Electric to perpetuate its failure to pay rent, which allowed EEI Holding Corporation/Egizii Electric to continue to maintain funds in its possession or control that may have otherwise been available to Borrower.

99.     Borrower's remaining assets were worth significantly less than the Loan indebtedness, and EEI Holding Corporation/Egizii Electric's failure to pay rent, and Borrower's attempt to reduce that rent, substantially reduced the value of the Plaintiff's security interest.

100.    The actions and omissions relative to the EEI Holding Corporation/Egizii Electric Lease and the Lease Amendments described in this Complaint are generally referred to as the "*Egizii Lease Transactions*."

101.    Upon information and belief, none of the Egizii Lease Transactions were arm's-length business transactions. Rather, Egizii retained control of both the lessor (in his individual capacity, and as representative of 700 North MacArthur, LLC and Borrower) and the lessee (as President and CEO of Egizii Electric, a division of EEI Holding Corporation) at all times relevant to this action.

### Lender's Foreclosure and Receivership Suit

102.    On November 26, 2014, Lender filed a mortgage foreclosure complaint to obtain title to the real estate secured by the Mortgages, as Case No. 14 CH 00456 in Sangamon County, Illinois Circuit Court (the "*Foreclosure Action*").

17

103.    The Foreclosure Action seeks an *in rem* judgment of foreclosure with respect to the North MacArthur Property and other real estate secured by the Mortgages. The Foreclosure Action does not seek personal recourse against Borrower for the amount of the deficiency following any foreclosure of the subject real estate, or assert any claims against Egizii.

104.    Pending a sale of the real estate, a receiver was appointed on December 23, 2014 as part of the Foreclosure Action.

105.    The receiver is authorized to collect rents from and after the date of its appointment, but is not entitled to collect the amount of net rents received by Borrower from the first Event of Default.

### *Borrower's Transfer of Net Rents and Distributions to Members*

106.    In the Demand Letter, Lender demanded that Borrower deliver all Rents and Cash Collateral to Lender, and confirmed that the Rents and Cash Collateral could not be used to pay attorneys' fees associated with Borrower's defaults.

107.    Despite this, Borrower directly or indirectly delivered proceeds of Rents and Cash Collateral to four separate law firms to hold in trust accounts and as retainers for legal services.

108.    Beginning in July 2013 and continuing until at least December 2014, Borrower transferred more than $1 million to Londrigan, Potter & Randle, P.C ("*Londrigan*") to hold in a client trust account (the "*Londrigan Trust Account*"). *See* letter from Londrigan dated January 28, 2015 and attachments, a true and complete copy of which is attached as EXHIBIT H, particularly page labeled "LPR Trust Account/Springfield Prairie Properties Trust Account".

109.    The balance held in the Londrigan Trust Account as of January 28, 2015 was $450,755.00. *Id.* The balance held by Londrigan in any client trust account on Borrower's behalf is referred to as the "*Londrigan Trust Account Funds*."

110.    Further, beginning in June 2013 and continuing until at least November 2014, Borrower transferred more than $2 million to Scott & Scott P.C. ("*Scott & Scott*") to hold in a client trust account (the "*Scott & Scott Trust Account*," and together with the Londrigan Trust

Account, the "**Trust Accounts**"). *See* Ex. H, particularly page labeled "Chase Bank: Springfield Prairie Properties, LLC Trust: Scott & Scott, PC, Trustee".

111.    The balance held in the Scott & Scott Trust Account as of January 28, 2015 was $400,831.17. *Id.* The balance held by Scott & Scott in any client trust account on Borrower's behalf is referred to as the "**Scott & Scott Trust Account Funds**," and together with the Londrigan Trust Account Funds, are the "**Trust Funds**."

112.    Borrower has withdrawn or directed disbursement of more than $2.3 million from the Trust Accounts between October 2013 and the present. *See generally* Ex. H.

113.    Specifically, but without limitation, the following sums have been disbursed from the Trust Accounts (*see* Ex. H):

a.  From the Scott & Scott Trust Account, on February 28, 2014:

| Recipient | Amount |
| --- | --- |
| Robert W. Egizii | $ 242,419.45 |
| Thomas Egizii | 34,750.46 |
| Michael Egizii | 11,305.72 |
| Rodney Egizii | 20,746.49 |
| Jodi Baptist | 8,103.06 |
| John Pruitt | 26,520.05 |
| Clyde Biemfohr | 72,410.25 |
| | $ 416,255.48 |

b.  From the Scott & Scott Trust Account, on May 30, 2014:

| Recipient | Amount |
| --- | --- |
| Robert W. Egizii | $ 116,195.23 |
| Thomas Egizii | 16,439.23 |
| Michael Egizii | 4,590.81 |
| Rodney Egizii | 9,056.91 |
| Jodi Baptist | 3,833.28 |
| John Pruitt | 12,545.71 |
| Clyde Biemfohr | 34,254.75 |
| | $ 196,915.92 |

c. From the Scott & Scott Trust Account, on September 10, 2014:

| Recipient | | Amount |
|---|---|---|
| Robert W. Egizii | $ | 56,422.53 |
| Thomas Egizii | | 7,982.63 |
| Michael Egizii | | 2,229.23 |
| Rodney Egizii | | 4,397.90 |
| Jodi Baptist | | 1,861.38 |
| John Pruitt | | 6,092.00 |
| Clyde Biemfohr | | 16,633.57 |
| | $ | 95,619.24 |

d. From the Scott & Scott Trust Account, $100,000 on October 25, 2013, to Borrower for "Operating Expenses" (with no further detail).

e. From the Scott & Scott Trust Account, $20,000 on March 5, 2014, to pay legal fees to Perkins Coie.

f. From the Scott & Scott Trust Account, $150,000.00 on September 24, 2014, to pay the Scott & Scott Retainer (defined and described below).

g. From the Londrigan Trust Account, on the dates noted below, to Borrower for undisclosed purposes:

| Date | | Amount |
|---|---|---|
| October 21, 2013 | $ | 71,245.00 |
| June 5, 2014 | | 50,000.00 |
| August 20, 2014 | | 100,000.00 |
| September 15, 2014 | | 25,000.00 |
| September 24, 2014 | | 150,000.00 |
| September 24, 2014 | | 150,000.00 |
| September 24, 2014 | | 100,000.00 |
| December 11, 2014 | | 50,000.00 |
| | $ | 696,245.00 |

114. In addition to the funds paid to Londrigan to hold in the Londrigan Trust Account, Londrigan was paid $150,000 on or about December 19, 2014 to serve as a retainer (the "*Londrigan Retainer*"). *See* Ex. H.

115.    Further, and in addition to the funds paid to Scott & Scott to hold in the Scott & Scott Trust Account, Scott & Scott was paid $150,000 on or about September 22, 2014 to serve as a retainer (the "*Scott & Scott Retainer*"). *See* Ex. H.

116.    A third law firm, Perkins Coie ("*Perkins Coie*") was also paid a retainer at a similar time. Specifically, Perkins Coie was paid $100,000 on or about September 24, 2014 (the "*Perkins Coie Retainer*"). *See* Ex. H.

117.    A fourth law firm, Sgro, Hanrahan, Durr & Rabin LLP ("*Sgro*," and together with Londrigan, Scott & Scott and Perkins Coie, the "*Law Firms*") was also paid a retainer at a similar time. Specifically, Sgro was paid $150,000 on or about October 8, 2014 (the "*Sgro Retainer*," and together with the Londrigan Retainer, the Scott & Scott Retainer and the Perkins Coie Retainer, the "*Retainers*"). *See* Ex. H.

118.    In the aggregate, $550,000 was deposited in Retainers with the Law Firms in late 2014.

119.    By comparison, based on financial statements provided by Borrower to Lender, Borrower paid $5,577.60 in legal fees in the aggregate in 2011, $0.00 in legal fees in the aggregate in 2012, and $143,464.43 in legal fees in the aggregate in 2013 (the year after Borrower's default under the Loan). *See* Borrower Profit and Loss Statements for 2011, 2012 and 2013 (through September), attached as EXHIBIT I.

120.    One or more of the Law Firms also represent EEI Holding Corporation.

121.    Because Borrower has no remaining assets under its control, Borrower is not an operating business, and has no reasonable expectation of future business activity.

122.    The transfer of funds to the Law Firms to hold in the Trust Accounts and Retainers, and the distributions made from the Trust Accounts, described in this Complaint are generally referred to as the "*Collateral Transfers*."

123.    In light of Borrower's transfer of the Trust Funds and the Retainers to the Law Firms, Lender filed a supplementary action against the Law Firms in United States District Court for the Central District of Illinois as Case No. 3:15-cv-03195-RM-TSH on May 29, 2015 (the

21

"*Injunction Action*"), seeking to enjoin further distribution, transfer or improper use of the Trust Funds and the Retainers.

## COUNT I
### JUDGMENT ON NOTE (IN PERSONAM) (FULL RECOURSE)
### (BORROWER, EEI HOLDING COMPANY/EGIZII ELECTRIC, EGIZII PROPERTY MANAGERS)

124.    Lender incorporates the preceding paragraphs by reference.

125.    Borrower failed to make the payments required under the Note, beginning with the payment due on October 11, 2012.

126.    Borrower's failure to make loan payments as required by the Note is an Event of Default pursuant to Section 2.1 of the Note.

127.    As a result of these and other defaults, Lender accelerated the maturity of the Loan and declared the entire Loan balance due and payable.

128.    Despite Lender's written demand for payment of the entire accelerated Loan balance, Borrower has failed to pay the accelerated Loan balance.

129.    Under the Note, Borrower agreed to be personally liable to Lender for the full amount due under the Loan if certain events occurred.

130.    Specifically, but without limitation, Borrower agreed under the Note that it would be fully and personally liable for the entire Loan balance if Borrower failed to obtain Lender's prior written consent to any transfer of the "Property":

> Notwithstanding anything to the contrary in this Note or any of the other Loan Documents, . . . (Y) all such indebtedness evidenced by the Note and the other obligations of Borrower under the Loan Documents shall be deemed fully recourse to Borrower in the event that: . . . (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or conveyance of the Property or any interest therein as required by the Mortgage[.]

Note, Ex. A, Section 1.5.

131.    Under the Note, "Property" includes "the security [for the indebtedness], the same being all properties (whether real or personal), rights, estates and interests now or at any time

22

securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents[.]" Note, Ex. A, Section 1.5.

132.    The security for the indebtedness includes, without limitation, all rents:

> BORROWER HEREBY IRREVOCABLY . . . GRANTS A SECURITY INTEREST, TO AND IN FAVOR OF LENDER AND ITS SUCCESSORS AND ASSIGNS, all of the following described property, whether now or hereafter acquired (collectively, the "Property"):
>
> *    *    *
>
> (H) All leases, licenses, tenancies, concessions and occupancy agreements of the Land or the Improvements now or hereafter entered into and all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "Rents" or "Rents and Profits") of the Land or the Improvements . . . .

Mortgages, Exs. B and C, Granting Clause, pp. 2-3 (capitalization in original).

133.    The Mortgages do not permit Borrower to transfer any portion of the Rents.

134.    Despite this, Borrower transferred the Rents by, without limitation, delivering a portion of the Rents to the Law Firms to hold in the Trust Accounts and the Retainers.

135.    Accordingly, Borrower is liable to Lender for all indebtedness evidenced by the Note and otherwise due under the terms of the Loan Documents.

136.    Lender has incurred and continues to incur direct and consequential damages, losses, costs and expenses, including but not limited to attorneys' fees, arising out of or relating to Borrower's defaults, and in connection with Lender's actions to enforce the provisions of the Loan Documents.

137.    Borrower, EEI Holding Corporation, Egizii Electric, and Egizii Property Managers each function as a mere instrumentality, alter ego and agent of Egizii in connection with the North MacArthur Property.

138.    Maintaining the separate corporate identities of EEI Holding Corporation/Egizii Electric and Egizii Property Managers will result in injustice to Lender because, upon

23

information and belief, assets were transferred from Borrower to these entities, or were not transferred to Borrower from these entities when they should have been, to prevent Lender from recovering on the Note.

WHEREFORE, Lender requests that this Court:

A.  Enter judgment against Borrower and in favor of Lender in the full amount provided by the terms of the Note and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Note and other Loan Documents; but less a credit for any bid at any foreclosure sale and the amount of any rents or other value received in the Foreclosure Action, if any;

B.  Pierce the corporate veil of Borrower and enter judgment against EEI Holding Corporation/Egizii Electric and Egizii Property Managers in the full amount provided by the terms of the Note and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Note and other Loan Documents; but less a credit for any bid by Lender at any foreclosure sale and the amount of any rents or other value received by Lender in the Foreclosure Action, if any; and

C.  Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

## COUNT II
### JUDGMENT ON NOTE (IN PERSONAM) (PARTIAL RECOURSE)
### (BORROWER, EEI HOLDING COMPANY/EGIZII ELECTRIC, EGIZII PROPERTY MANAGERS)

139.  Lender incorporates the preceding paragraphs by reference.

140.  Borrower failed to make the payments required under the Note, beginning with the payment due on October 11, 2012.

24

141.    Borrower's failure to make loan payments as required by the Note is an Event of Default pursuant to Section 2.1 of the Note.

142.    As a result of these and other defaults, Lender accelerated the maturity of the Loan and declared the entire Loan balance due and payable.

143.    Despite Lender's written demand for payment of the entire accelerated Loan balance, Borrower has failed to pay the accelerated Loan balance.

144.    Under the Note, Borrower agreed to be personally liable to Lender for certain losses, including but not limited to any rent not paid to Lender after an Event of Default:

> [N]otwithstanding the foregoing provisions of this section, Borrower shall be fully and personally liable and subject to legal action as follows:
>
> *     *     *
>
> (e) for rents, issues, profits and revenues of all or any portion of the Property which are not either applied to the ordinary and necessary expenses of owning and operating the Property or paid to Lender but only to the extent such rents, issues, profits and revenues are received or applicable to a period after either an Event of Default or notice from Lender that an event or circumstances has occurred which, with the passage of time or giving of further notice or both, would constitute an Event of Default[.]

Note, Ex. A, Section 1.5.

145.    This provision is not an assignment of rents, but rather an agreement by Borrower to be liable for the *amount* of any post-default Rents not delivered to Lender.

146.    Despite Lender's written demand, Borrower has failed to deliver any Rents or Cash Collateral to Lender.

147.    Accordingly, Borrower is liable to Lender for the amount of, without limitation, (i) all net rents, issues, profits and revenues of all or any portion of the property subject to the Mortgages received or applicable to the period from October 11, 2012 to the present, plus (ii) all attorneys' fees and costs incurred by Lender.

25

148.    Lender has incurred and continues to incur direct and consequential damages, losses, costs and expenses, including but not limited to attorneys' fees, arising out of or relating to Borrower's defaults, and in connection with Lender's actions to enforce the provisions of the Loan Documents.

149.    Borrower, EEI Holding Corporation/Egizii Electric, and Egizii Property Managers each function as a mere instrumentality, alter ego and agent of Egizii in connection with the North MacArthur Property.

150.    Maintaining the separate corporate identities of EEI Holding Corporation/Egizii Electric and Egizii Property Managers will result in injustice to Lender because, upon information and belief, assets were transferred from Borrower to these entities, or were not transferred to Borrower from these entities when they should have been, to prevent Lender from recovering on the Note.

WHEREFORE, Lender requests that this Court:

A.    Enter judgment against Borrower and in favor of Lender in the full amount provided by the terms of the Note and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Note and other Loan Documents; but less a credit for any bid at any foreclosure sale and the amount of any rents or other value received in the Foreclosure Action and the Injunction Action, if any;

B.    Pierce the corporate veil of Borrower and enter judgment against EEI Holding Corporation/Egizii Electric and Egizii Property Managers in the full amount provided by the terms of the Note and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Note and other Loan Documents; but less a credit for any bid by Lender at any foreclosure

sale and the amount of any rents or other value received by Lender in the Foreclosure Action and the Injunction Action, if any; and

C.      Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

## COUNT III
### JUDGMENT ON GUARANTY (PARTIAL RECOURSE)
### (EGIZII)

151.    Lender incorporates the preceding paragraphs by reference.

152.    Borrower failed to make the payments required under the Note, beginning with the payment due on October 11, 2012.

153.    Borrower's failure to make loan payments as required by the Note is an Event of Default pursuant to Section 2.1 of the Note.

154.    As a result of these and other defaults, Lender accelerated the maturity of the Loan and declared the entire Loan balance due and payable.

155.    Despite Lender's written demand for payment of the entire accelerated Loan balance, Egizii has failed to pay the accelerated Loan balance.

156.    Pursuant to the Guaranty, Egizii guaranteed payment of all losses suffered by Lender as a result of Borrower's failure to deliver all Rents to Lender:

**[EGIZII] HEREBY ASSUMES LIABILITY FOR, HEREBY GUARANTEES PAYMENT TO LENDER OF . . . ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) . . . IMPOSED UPON, INCURRED BY OR AWARDED AGAINST LENDER AS A RESULT OF:**

**\*      \*      \***

**RENTS, ISSUES, PROFITS AND REVENUES OF ALL OR ANY PORTION OF THE PROPERTY WHICH ARE NOT EITHER APPLIED TO THE ORDINARY AND NECESSARY EXPENSES OF OWNING AND OPERATING THE PROPERTY OR PAID TO LENDER BUT ONLY TO THE EXTENT SUCH**

27

**RENTS, ISSUES, PROFITS AND REVENUES ARE RECEIVED OR APPLICABLE TO A PERIOD AFTER EITHER AN "EVENT OF DEFAULT" (AS DEFINED IN SECTION 2.1 OF THE MORTGAGE) OR NOTICE FROM LENDER THAT AN EVENT OR CIRCUMSTANCE HAS OCCURRED WHICH, WITH THE PASSAGE OF TIME OR GIVING OF FURTHER NOTICE OR BOTH, WOULD CONSTITUTE SUCH AN EVENT OF DEFAULT[.]**

Guaranty, Ex. D, Section 1 (bold and capitalization in original).

157.   Egizii agreed that the Guaranty is "a guaranty of payment and performance and not of collection," that Egizii's liability "shall be absolute, direct and immediate and not conditional or contingent," and that Lender's recovery is not contingent upon its recovery "against the collateral for the Loan." Guaranty, Ex. D, Section 1.

158.   This provision is not an assignment of rents, but rather an agreement by Egizii to be liable for the *amount* of any post-default Rents not delivered to Lender.

159.   Despite Lender's written demand, Borrower and Egizii have failed to deliver any Rents to Lender.

160.   Accordingly, Egizii is liable to Lender for the amount of, without limitation, (i) all net rents, issues, profits and revenues of all or any portion of the property subject to the Mortgages received or applicable to the period from October 11, 2012 to the present, plus (ii) all attorneys' fees and costs incurred by Lender.

161.   EEI Holding Corporation/Egizii Electric, and Egizii Property Managers each function as a mere instrumentality, alter ego and agent of Egizii in connection with the North MacArthur Property.

162.   Maintaining the separate corporate identities of EEI Holding Corporation/Egizii Electric and Egizii Property Managers will result in injustice to Lender because Egizii caused assets to be transferred to these entities, prevented assets from being transferred by these entities when they should have been, to prevent Lender from recovering on the Guaranty.

28

163.    Lender has incurred and continues to incur direct and consequential damages, losses, costs and expenses, including but not limited to attorneys' fees, arising out of or relating to Borrower's defaults, and in connection with Lender's actions to enforce the provisions of the Loan Documents.

WHEREFORE, Lender requests that this Court:

A.    Enter judgment against Egizii and in favor of Lender in the full amount provided by the terms of the Guaranty and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Guaranty and other Loan Documents; but less a credit for any bid at any foreclosure sale and the amount of any rents or other value received in the Foreclosure Action, if any;

B.    Pierce the corporate veil and enter judgment against EEI Holding Corporation/Egizii Electric and Egizii Property Managers in the full amount provided by the terms of the Guaranty and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Guaranty and other Loan Documents; but less a credit for any bid by Lender at any foreclosure sale and the amount of any rents or other value received by Lender in the Foreclosure Action and the Injunction Action, if any; and

C.    Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

**COUNT IV**
**JUDGMENT ON GUARANTY (FULL RECOURSE)**
**(EGIZII)**

164.    Lender incorporates the preceding paragraphs by reference.

165.    Borrower failed to make the payments required under the Note, beginning with the payment due on October 11, 2012.

166.    Borrower's failure to make loan payments as required by the Note is an Event of Default pursuant to Section 2.1 of the Note.

167.    As a result of these and other defaults, Lender accelerated the maturity of the Loan and declared the entire Loan balance due and payable.

168.    Despite Lender's written demand for payment of the entire accelerated Loan balance, Egizii has failed to pay the accelerated Loan balance.

169.    Under the Guaranty, Egizii agreed that he would be liable for the entire Loan indebtedness under the same circumstances that trigger liability for Borrower:

> **[EGIZII] ACKNOWLEDGES THAT <u>PHRASE (Y) IN SECTION 1.5</u> OF EACH OF THE NOTES DESCRIBES CIRCUMSTANCES WHEREIN THE ENTIRE INDEBTEDNESS EVIDENCED BY SUCH NOTE AND THE OTHER OBLIGATIONS OF BORROWER UNDER THE LOAN DOCUMENTS WOULD BECOME FULLY RECOURSE TO BORROWER. IF SUCH CIRCUMSTANCE SHOULD OCCUR THEN [EGIZII] SHALL ADDITIONALLY BE DIRECTLY AND PRIMARILY LIABLE, ON A JOINT AND SEVERAL BASIS, FOR THE ENTIRE INDEBTEDNESS EVIDENCED BY THE NOTE AND FOR ALL OF BORROWER'S OBLIGATIONS UNDER THE LOAN DOCUMENTS[.]**

Guaranty, Ex. D, Section 1 (bold and capitalization in original).

170.    Under Phrase Y of Section 1.5 of the Note, Borrower agreed that it would be fully and personally liable for the entire Loan balance if Borrower failed to obtain Lender's prior written consent to any transfer of the "Property":

> Notwithstanding anything to the contrary in this Note or any of the other Loan Documents, . . . (Y) all such indebtedness evidenced by the Note and the other obligations of Borrower under the Loan Documents shall be deemed fully recourse to Borrower in the event that: . . . (iii) Borrower fails to obtain Lender's prior written consent to any assignment, transfer, or

> conveyance of the Property or any interest therein as required by the Mortgage[.]

Note, Ex. A, Section 1.5.

171. Under the Note, "Property" includes "the security [for the indebtedness], the same being all properties (whether real or personal), rights, estates and interests now or at any time securing the payment of this Note and/or the other obligations of Borrower under the Loan Documents[.]" Note, Ex. A, Section 1.5.

172. The security for the indebtedness includes, without limitation, all Rents:

> BORROWER HEREBY IRREVOCABLY . . . GRANTS A SECURITY INTEREST, TO AND IN FAVOR OF LENDER AND ITS SUCCESSORS AND ASSIGNS, all of the following described property, whether now or hereafter acquired (collectively, the "Property"):
>
> *       *       *
>
> (H) All leases, licenses, tenancies, concessions and occupancy agreements of the Land or the Improvements now or hereafter entered into and all rents, royalties, issues, profits, bonus money, revenue, income, rights and other benefits (collectively, the "Rents" or "Rents and Profits") of the Land or the Improvements . . . .

Mortgages, Exs. B and C, Granting Clause, pp. 2-3 (capitalization in original).

173. The Mortgages do not permit Borrower to transfer any portion of the Rents.

174. Despite this, Borrower transferred the Rents by, without limitation, delivering a portion of the Rents to the Law Firms to hold in the Trust Accounts and the Retainers.

175. Accordingly, Egizii is liable to Lender for all indebtedness evidenced by the Note and otherwise due under the terms of the Loan Documents.

176. EEI Holding Corporation/Egizii Electric and Egizii Property Managers each function as a mere instrumentality, alter ego and agent of Egizii in connection with the North MacArthur Property.

177. Maintaining the separate corporate identities of EEI Holding Corporation/Egizii Electric and Egizii Property Managers will result in injustice to Lender because, upon

31

information and belief, Egizii caused assets to be transferred to these entities, prevented assets from being transferred by these entities when they should have been, to prevent Lender from recovering on the Guaranty.

178.    Lender has incurred and continues to incur direct and consequential damages, losses, costs and expenses, including but not limited to attorneys' fees, arising out of or relating to Borrower's defaults, and in connection with Lender's actions to enforce the provisions of the Loan Documents.

WHEREFORE, Lender requests that this Court:

A.    Enter judgment against Egizii and in favor of Lender in the full amount provided by the terms of the Guaranty and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Guaranty and other Loan Documents; but less a credit for any bid by Lender at any foreclosure sale and the amount of any rents or other value received by Lender in the Foreclosure Action and the Injunction Action, if any;

B.    Pierce the corporate veil and enter judgment against EEI Holding Corporation/Egizii Electric and Egizii Property Managers in the full amount provided by the terms of the Guaranty and by law, plus interest and default interest accruing since the first date of default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover under the terms of the Guaranty and other Loan Documents; but less a credit for any bid at any foreclosure sale and the amount of any rents or other value received in the Foreclosure Action and the Injunction Action, if any; and

C.    Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

## COUNT V
### BREACH OF ILLINOIS LIMITED LIABILITY COMPANY ACT
### (BORROWER AND MEMBERS)

179.    Lender incorporates the preceding paragraphs by reference.

180.    Under the Illinois Limited Liability Company Act, limited liability companies may not make distributions while insolvent (805 ILCS 180/25-30(a)):

> A distribution [from a limited liability company's assets] may not be made if:
>
> (1) the limited liability company would not be able to pay its debts as they became due in the ordinary course of business; or
>
> (2) the company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the company were to be dissolved, wound up, and terminated at the time of the distribution, to satisfy the preferential rights upon dissolution, winding up, and termination of members whose preferential rights are superior to those receiving the distribution.

181.    Borrower failed to make the payments required under the Note, beginning with the payment due on October 11, 2012.

182.    Borrower's failure to make loan payments as required by the Note is an Event of Default pursuant to Section 2.1 of the Note.

183.    As a result of Borrower's defaults, Lender accelerated the Loan balance and demanded payment in full pursuant to the Demand Letter.

184.    Borrower represented and warranted that it did not and would not own any assets other than the collateral secured by the Mortgages.

185.    The value of the real estate secured by the Mortgages is substantially less than the amount owed to Lender under the Loan.

186.    Borrower is therefore insolvent, at least since the date that Lender accelerated the Loan.

187. Despite this, over $700,000 was distributed from the Trust Accounts held for Borrower's benefit with Londrigan and Scott & Scott, and sent to the Members.

188. The earliest such distribution was made eleven months after Lender gave formal notice that the Loan had been accelerated.

189. Upon information and belief, each Member either voted for or assented to each distribution made to the Members in 2014.

190. Upon information and belief, each Member knew or should have known that Borrower was insolvent at the time of the distributions in 2014.

191. Under the Illinois Limited Liability Company Act, each Member who voted for or assented to a distribution made in violation of Section 25-30, or who knew a distribution was made in violation of Section 25-30, is liable for the amount of that distribution. *See* 805 ILCS 180/25-35.

WHEREFORE, Lender requests that this Court:

A. Enter judgment against the Members, in favor of Lender, in an amount equal to the funds received by the Members from Borrower, either directly or indirectly, including but not limited to any funds received from the Law Firms and/or the Trust Accounts, from and after October 11, 2012;

B. Order that all funds received by the Members from Borrower, either directly or indirectly, including but not limited to any funds received from the Law Firms and/or the Trust Accounts, from and after October 11, 2012, be paid to Lender; and

C. Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

**COUNT VI**
**UNIFORM FRAUDULENT TRANSFER ACT:**
**CONSTRUCTIVE FRAUD**
**(BORROWER AND MEMBERS)**

192. Lender incorporates the preceding paragraphs by reference.

193.   The Illinois Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.*) ("**UFTA**") provides that both actual and constructive fraudulent transfers are void (740 ILCS 160/5):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> *       *       *
>
> (2) without receiving reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (b) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

194.   A "transfer" under the UFTA means "**every mode, direct or indirect, absolute or conditional**, voluntary or involuntary, **of disposing of or parting with an asset or interest in an asset**, and includes **payment of money**, release, **lease**, and creation of a lien or other encumbrance." 740 ILCS 160/2(l) (emphasis added).

195.   Under the UFTA, the Borrower "is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a).

196.   Further, under the UFTA, Borrower "is presumed to be insolvent" if it "is generally not paying his debts as they become due[.]" 740 ILCS 160/3(b).

197.   Borrower was insolvent or became insolvent as a result of Lender's acceleration of the Loan because, upon acceleration of the indebtedness due in connection with the Loan, the sum of Borrower's debts was greater than the sum of its assets at a fair valuation, and because Borrower failed to pay its debt to Lender as it came due.

198.    An "insider" under the UFTA includes, without limitation, director, an officer, a person in control, and a relative of a director, officer or person in control of the Borrower. *See* 740 ILCS 160/2(g).

199.    The Members, including but not limited to Egizii, are "insiders" of Borrower within the meaning of the UFTA because they are directors, officers or persons in control of Borrower, and one or more of the Members may be relatives of Egizii, who is a director, officer or person in control of the Borrower.

200.    As part of the Collateral Transfers, Borrower transferred Rents to the Law Firms, which are held in the form of the Trust Funds and the Retainers.

201.    As part of the Collateral Transfers, Borrower exercised continuing control over the Trust Funds, and permitted or directed distribution of the Trust Funds at least to the Members and back to Borrower, and perhaps to other insiders or third parties.

202.    Borrower engaged in the Collateral Transfers without receiving reasonably equivalent value in exchange for the transfers. *See* 740 ILCS 160/5(a)(2).

203.    When Borrower engaged in the Collateral Transfers, Borrower had already or reasonably should have believed it would incur debts beyond its ability to pay as they became due, in the form of the Loan payments and the accelerated Loan balance, and when Borrower was insolvent. *See* 740 ILCS 160/5(a)(2)(B); 740 ILCS 160/6(a).

204.    The transferees of the Collateral Transfers, and including but not limited to the Members, are not "good-faith transferees" under the UFTA. *See* 740 ILCS 160/9(a).

205.    Lender was harmed as a result of the Collateral Transfers in that significant assets were transferred from Borrower to other persons and entities, thereby depriving Lender of access to those assets to satisfy the indebtedness under the Loan while unjustly benefiting and enriching the Members (including Egizii).

WHEREFORE, Lender requests that this Court:

A.    Avoid any and all transfers of Rents to the Law Firms, and from the Law Firms to the Members and any other persons and entities, from and after March 28, 2013;

36

B.      Attach the assets of the Members and any other recipients of distributions from the Trust Accounts;

C.      Order that the Trust Funds be paid to Lender;

D.      Order that the Retainers be paid to Lender;

E.      Attach the Trust Accounts and the Retainers;

F.      Enjoin any further distribution or use of the Trust Funds or Retainers;

G.      Compel the discovery of all assets of the Members, complete records regarding the Trust Accounts and Retainers, complete records regarding all Rents and other funds received and transferred (within the meaning of the UFTA) by Borrower from and after October 11, 2012, and such other documents and information as Lender may request in connection with the Egizii Lease Transactions, the Collateral Transfers and the Rents;

H.      Order that any judgment entered pursuant to this Complaint may be satisfied from property found through the discovery described above; and

I.      Make such other Order as may be fair and equitable to carry out the full intent and purpose of the Uniform Fraudulent Transfer Act.

**COUNT VII**
**UNIFORM FRAUDULENT TRANSFER ACT**
**ACTUAL FRAUD**
**(BORROWER AND MEMBERS)**

206.    Lender incorporates the preceding paragraphs by reference.

207.    The Illinois Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.*) ("*UFTA*") provides that both actual and constructive fraudulent transfers are void (740 ILCS 160/5):

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> > (1) with the actual intent to hinder, delay, or defraud any creditor of the debtor; . . . .

208. A "transfer" under the UFTA means "**every mode, direct or indirect, absolute or conditional**, voluntary or involuntary, **of disposing of or parting with an asset or interest in an asset**, and includes **payment of money**, release, **lease**, and creation of a lien or other encumbrance." 740 ILCS 160/2(l) (emphasis added).

209. Under the UFTA, the Borrower "is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." 740 ILCS 160/3(a).

210. Further, under the UFTA, Borrower "is presumed to be insolvent" if it "is generally not paying his debts as they become due[.]" 740 ILCS 160/3(b).

211. Borrower was insolvent or became insolvent as a result of Lender's acceleration of the Loan because, upon acceleration of the indebtedness due in connection with the Loan, the sum of Borrower's debts was greater than the sum of its assets at a fair valuation, and because Borrower failed to pay its debt to Lender as it came due.

212. An "insider" under the UFTA includes, without limitation, director, an officer, a person in control, and a relative of a director, officer or person in control of the Borrower. *See* 740 ILCS 160/2(g).

213. The Members, including but not limited to Egizii, are "insiders" of Borrower within the meaning of the UFTA because they are directors, officers or persons in control of Borrower, and one or more of the Members may be relatives of Egizii, who is a director, officer or person in control of the Borrower.

214. As part of the Collateral Transfers, Borrower transferred Rents to the Law Firms, which are held in the form of the Trust Funds and the Retainers.

215. As part of the Collateral Transfers, Borrower exercised continuing control over the Trust Funds, and permitted or directed distribution of the Trust Funds at least to the Members and back to Borrower, and perhaps to other insiders or third parties.

216. The Collateral Transfers are part of a continuing plan or scheme undertaken with the intent to hinder, delay or defraud creditors – in particular, the A Note Holder and B Note Holder – and are therefore void.

217. This intent to hinder, delay or defraud creditors is demonstrated by the following circumstances (or "badges of fraud"), by way of example and not limitation:

    a. The transfers out of the Trust Accounts were largely either back to Borrower, or to Borrower's Members, who are insiders. 740 ILCS 160/5(b)(1).

    b. Borrower's transfers to the Trust Accounts were to accounts over which Borrower could exercise continuing dominion and control. *See* 740 ILCS 160/5(b)(2).

    c. The Retainers contain funds over which Borrower can exercise effective control as Borrower can direct the activities of its attorneys—and certainly does not need four separate law firms incurring redundant fees to represent it in connection with Borrower's defaults on the Loan. *See* 740 ILCS 160/5(b)(2).

    d. Borrower's transfers to the Law Firms were concealed from Lender until mid-2014, and additional information was not disclosed until January 2015. *See* 740 ILCS 160/5(b)(3).

    e. The transfers out of the Trust Accounts, particularly to Borrower's Members, were concealed from Lender under mid-2014. *See* 740 ILCS 160/5(b)(3).

    f. Borrower was threatened with suit in the Demand Letter in March 2013, before any funds were deposited in the Trust Accounts and before any of the Retainers was paid. *See* 740 ILCS 160/5(b)(4).

    g. Borrower transferred substantially all of its liquid assets (cash) to the Law Firms to hold in the Trust Accounts and Retainers. *See* 740 ILCS 160/5(b)(5).

    h. Borrower removed assets from its own accounts and concealed them in the various Trust Accounts and Retainers. *See* 740 ILCS 160/5(b)(7).

i.   Borrower's assets were removed from the Trust Accounts and delivered to Borrower's Members. *See* 740 ILCS 160/5(b)(7).

j.   Borrower received no consideration for the funds delivered to the Law Firms, or for the funds disbursed from the Trust Accounts to the Members and others. *See* 740 ILCS 160/5(b)(8).

k.   Borrower was insolvent when the transfers to the Law Firms occurred, and when funds were disbursed from the Trust Accounts. *See* 740 ILCS 160/5(b)(9).

l.   The transfers occurred shortly after the Loan was accelerated in March 2013. *See* 740 ILCS 160/5(b)(10).

m.   Borrower transferred the essential assets of its business (net cash flow) to lienors (Londrigan and Scott & Scott), who transferred those assets to insiders of Borrower (the Members). *See* 740 ILCS 160/5(b)(11).

218.   Furthermore, Borrower's payment of the Retainers, and the distributions from the Trust Accounts (including but not limited to Borrower's Members), were transfers made to insiders (the Members) for an antecedent debt, at a time when Borrower was insolvent, and when the insiders (Members) had reasonable cause to believe that Borrower was insolvent. *See* 740 ILCS 160/6(b).

219.   The transferees of the Collateral Transfers, and including but not limited to the Members, are not "good-faith transferees" under the UFTA. *See* 740 ILCS 160/9(a).

220.   Lender was harmed as a result of the Collateral Transfers in that significant assets were transferred from Borrower to other persons and entities, thereby depriving Lender of access to those assets to satisfy the indebtedness under the Loan while unjustly benefiting and enriching the Members (including Egizii).

WHEREFORE, Lender requests that this Court:

A.   Avoid any and all transfers of Rents to the Law Firms, and from the Law Firms to the Members and any other persons and entities, from and after March 28, 2013;

B.     Attach the assets of the Members and any other recipients of distributions from the Trust Accounts;

C.     Order that the Trust Funds be paid to Lender;

D.     Order that the Retainers be paid to Lender;

E.     Attach the Trust Accounts and the Retainers;

F.     Enjoin any further distribution or use of the Trust Funds or Retainers;

G.     Compel the discovery of all assets of the Members, complete records regarding the Trust Accounts and Retainers, complete records regarding all Rents and other funds received and transferred (within the meaning of the UFTA) by Borrower from and after October 11, 2012, and such other documents and information as Lender may request in connection with the Egizii Lease Transactions, the Collateral Transfers and the Rents;

H.     Order that any judgment entered pursuant to this Complaint may be satisfied from property found through the discovery described above; and

I.     Make such other Order as may be fair and equitable to carry out the full intent and purpose of the Uniform Fraudulent Transfer Act.

## COUNT VIII
### CIVIL CONSPIRACY
### (ALL DEFENDANTS)

221.   Lender incorporates the preceding paragraphs by reference.

222.   Upon information and belief, two or more of the Defendants knowingly conspired in a common scheme or plan to place the assets of Borrower, Egizii or both outside the reach of their creditors, including Lender.

223.   Upon information and belief, two or more of the Defendants engaged in the Collateral Transfers and Lease Transactions in furtherance of this common scheme or plan.

41

224.    Upon information and belief, the Collateral Transfers and Lease Transactions were executed by two or more of the Defendants for unlawful purposes, including but not limited to avoiding Borrower's and Egizii's obligations to their creditors, including Lender.

225.    Upon information and belief, two or more of the Defendants sought to accomplish this purpose by unlawful means, including but not limited to breaching contractual obligations, breaching the Illinois Limited Liability Company Act and engaging in fraudulent transfers.

226.    Upon information and belief, in furtherance of this conspiracy, one or more of the Defendants engaged in one or more unlawful acts, including but not limited to breaching contractual obligations, breaching the Illinois Limited Liability Company Act and engaging in fraudulent transfers.

227.    As a direct and proximate result of the conspiracy and Defendants' conduct, including but not limited to the Collateral Transfers and the Lease Transactions, Lender has suffered damages.

WHEREFORE, Lender requests that this Court:

A.    Enter judgment against Defendants and in favor of Lender in the full amount for which Borrower is liable under the terms of the Note and by law, plus interest and default interest accruing since the first date of Borrower's default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover from Borrower under the terms of the Note and other Loan Documents; but less a credit for any bid by Lender at any foreclosure sale and the amount of any rents or other value received by Lender in the Foreclosure Action and the Injunction Action, if any; and

B.    Grant Lender all further relief to which it may be entitled and the Court deems just and equitable.

## COUNT IX
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RIGHTS
### (EEI HOLDING CORPORATION/EGIZII ELECTRIC)

228.   Lender incorporates the preceding paragraphs by reference.

229.   Under the Note and other Loan Documents, Borrower was contractually obligated to make periodic payments to Lender.

230.   The Note and other Loan Documents are valid and enforceable.

231.   Upon information and belief, EEI Holding Corporation/Egizii Electric was aware of the Note and other Loan Documents.

232.   Egizii, as guarantor of the Loan and as President and CEO of EEI Holding Corporation and Egizii Electric, was aware of both the Loan Documents and the Lease.

233.   Upon information and belief, EEI Holding Corporation/Egizii Electric failed to pay the full rental rate required under the terms of the Lease, at least from September 1, 2011 to October 1, 2012.

234.   The failure of EEI Holding Corporation/Egizii Electric to pay the full rental rate due to Borrower under the terms of the Lease at least from September 1, 2011 to October 1, 2012 directly caused Borrower to have fewer funds available to satisfy the terms of its contracts with Lender.

235.   Upon information and belief, EEI Holding Corporation/Egizii Electric failed to make any payments due under the terms of the Lease beginning with the payment due on November 1, 2012.

236.   The failure of EEI Holding Corporation/Egizii Electric to make any payments to Borrower under the terms of the Lease directly caused Borrower to have fewer funds available to satisfy the terms of its contracts with Lender.

237.   Upon information and belief, the breaches by EEI Holding Corporation/Egizii Electric of the terms of the Lease were intentional and unjustified.

238.    Contemporaneously with the failure of EEI Holding Corporation/Egizii Electric to make any further monthly payments to Borrower under the terms of the Lease, Borrower defaulted under the Loan.

239.    Borrower's default under the terms of the Loan and Loan Documents was caused in part by the failure of EEI Holding Corporation/Egizii Electric to pay the full rental payments due, and then to pay any amounts due, under the terms of the Lease.

240.    As a result of these and other breaches of the Lease by EEI Holding Corporation/Egizii Electric, and Borrower's related breach of its contractual obligations to Lender under the terms of the Note and other Loan Documents, Lender has suffered damages, as provided under the terms of the Loan Documents.

WHEREFORE, Lender requests that this Court:

A.    Enter judgment against EEI Holding Corporation/Egizii Electric and in favor of Lender in the full amount for which Borrower is liable under the terms of the Note and by law, plus interest and default interest accruing since the first date of Borrower's default, plus all other fees and costs, including attorneys' fees, that Lender is entitled to recover from Borrower under the terms of the Note and other Loan Documents; but less a credit for any bid by Lender at any foreclosure sale and the amount of any rents or other value received by Lender in the Foreclosure Action and the Injunction Action, if any; and

B.     Grant Lender all further relief to which it may be entitled and the Court deems

just and equitable.

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.


By:___s/Cara M. Houck_____
       One of its attorneys

Cara M. Houck (06239153)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
225 West Washington Street
Suite 2600
Chicago, Illinois 60606
(312) 460-4200

24367334.6\131316-00063